## JAMES DOWDALL
### v.
## ALSIE A. CANNEDY.

*Administration—Transfer of Interest—Subsequent Sale—Fraudulent Misrepresentations—Cancellation of Deeds—Interest.*

1. The denial of the petition of a legatee for an order on the administrator to pay a balance claimed to be due over and above the sum paid for the legatee's interest by said administrator, who, subsequent to the purchase, sold the property in question by order of court, can not operate as a bar to a bill in behalf of the legatee to set aside the conveyances made, upon the ground of fraudulent procurement.

2. Honest misstatements by an administrator as to the legal effect of the provisions of a will do not constitute fraud.

[Opinion filed November 23, 1889.]

APPEAL from the Circuit Court of Greene County; the Hon. G. W. HERDMAN, Judge, presiding.

Mr. MARK MEYERSTEIN, for appellant.

Mr. JOHN G. HENDERSON and RINAKER & RINAKER, for appellee.

PLEASANTS, P. J. The parties to this suit are brother and sister residing in the county of Greene. George L. Dowdall, another brother, who resides in Macoupin, died there on the 6th of June, 1879, leaving a will by which he devised all his

real estate to his wife for her life, and in case she should have issue by a future marriage, to her and such issue in fee, but if she should die without issue, then that at her death it should be sold and the proceeds equally divided between his father, brothers, sister, sister-in-law, and two half sisters jointly, making eight equal parts. The same disposition was made of his personal property. His wife was named to be his executrix, but she did not survive him, and he left no descendant. On the 1st day of July, appellant was duly appointed administrator with the will annexed. As such, in the fall of that year he made sale of the personal effects, which realized about enough to pay the debts. In November, 1880, he purchased of appellee her interest in the real estate for $1,200 cash, and took a conveyance thereof in the form of two quit-claim deeds, the land lying in two counties. In August, 1881, he sold all the real estate, under an order of the County Court, to Don A. Burke for $11,750, one-half cash, and the balance in a note, at one year, with interest at eight per cent. In November following appellee filed her petition to that court for an order on appellant as such administrator to pay over to her the balance of the share of the proceeds of said estate to which she was entitled under the will, after deducting the $1,200 paid to her as above stated, which petition he successfully resisted, the court holding that by virtue of the quit-claim deeds mentioned she had ceased to have any interest in said estate. On her appeal from that order denying her petition the Circuit Court held the same way and affirmed it. Thereupon on the 12th day of January, 1885, she filed the bill herein, praying to have said deeds canceled, and for the relief sought by said petition.

It sets forth the facts above stated, excepting the filing of said petition and the proceedings therein, and avers that before she was informed of the provisions of the will or of her rights thereunder, and before defendant, as administrator, had made any report of the condition of said estate, he came to her and solicited the purchase of her interest in it; that she then told him she did not know what it amounted to, nor what right or power she had to sell or convey it, nor when

Dowdall v. Cannedy.

she would be entitled to it or any part of it; that he told her he didn't know just what it would amount to; that there were debts coming against the estate of which he had not heard until recently; that the land would have to be divided by a partition suit, which would involve cost and expense and delay; that there now was a minor heir less than a year old, which she knew was a fact; that he then further stated that the land could not be divided, nor the proceeds thereof, until said minor was of age; that complainant therefore might not receive anything from them in her lifetime; and that he would then, November 6, 1880, give her in ready money the sum of $1,200, for all her interest in said estate; that knowing he was a man of business experience, and well acquainted with the condition of the estate and the provisions of the will, and having confidence in him and in his disposition toward her "as her brother and as the trustee, as it were, of her interests," she accepted all his statements as true, and sold and conveyed all her interest in the real and personal estate of the testator on the terms proposed.    It then avers that she afterward discovered he had "grossly deceived" her in respect to the condition of the estate and the terms and effect of the will, and as to when the land could be divided and when she could obtain her share of the proceeds of the sale of the same; that from his reports thereafter made by him as administrator it appeared that of the proceeds of real and personal property of the estate she was entitled, for her share as heir and under the will, to $1,939.92.

Besides the averment that he had "grossly deceived" her, as above set forth, all that the bill contains as a charge of fraud is the following:  "That by the abuse of her confidence in his fairness and good faith, and by the disregard of his duty in the premises, and the abuse and betrayal of his trust, seeking to speculate upon the trust funds so being in his hands to administer and to wrongfully deprive your oratrix of her fair share of said estate, he has wronged and cheated her out of more than one entire third of her just net share of said estate."  A demurrer to this bill was overruled and the defendant answered, denying the gravamen thereof, and set-

ting up as a further bar the order and judgment of the Circuit and County Court above referred to, as having been made upon a hearing on the same grounds of claim here relied on. To these special matters in the answer exceptions were filed, the consideration of which was reserved to the final hearing.

Upon the pleadings and the proofs taken and reported by the master, the court found that said sale and conveyance was procured to be made by the fraudulent representations and deceptions practiced by defendant, and abuse of confidence reposed in him by his sister, the complainant, because of his relationship to her and of his being administrator with the will annexed of said estate, and thereupon decreed the sale and deeds void and canceled, and that defendant account for and pay over to her so much of the proceeds of his sale of said lands and of the personal estate as she was entitled to, to-wit, thirty-five two hundred twenty-fourths of the same, with interest from the date of the filing of the bill, which on further reference to the master to ascertain and compute, was found and decreed to be (including interest to November 24, 1888, the date of the decree, amounting to $131.83) the sum of $895.23. Exceptions were duly taken to the master's reports and to the several orders and decrees of the court.

Upon the assumption that this sale by appellant was obtained by fraud, we do not think she had a remedy at law, either in the Probate or Circuit Court, nor that the judgments of those courts upon her petition referred to were such adjudications as would bar the relief sought by this bill. The deeds of conveyance stood in the way, an insurmountable obstacle. The direct object of the bill was to remove it by their cancellation, and the power to cancel them was in the chancellor alone. Obtaining jurisdiction for that purpose he would retain it to do complete justice in the premises between the parties. But we are clearly of opinion that no proper case was here made for the rightful exercise of that power.

Besides the documents introduced, the only evidence in the record is the testimony of complainant and her husband, in her behalf, and of the defendant in his own. At the time of the sale

in question she was about fifty years of age, for many of which she had been, as she then was, living with her husband, who was something over sixty, on their farm in Greene county. Habitual or frequent personal association with the defendant had thus been long broken up and her life identified with that of a nearer and dearer one.   She consulted her husband most fully throughout this whole transaction.   The purchase of her interest was not proposed until June, 1880, nearly or quite a year after the death of the testator and probate of the will. Within two weeks after his death she was correctly informed of the provisions of the will and of her interest in the estate. With her husband she had attended the sale of the personal property, which took place on the farm, the fall before; and according to her own statement, she found out that night or the next morning what it amounted to.   She also says she knew there was a considerable indebtedness against the estate. She did not know the amount of that.   But the defendant was then also ignorant of it, as debts were coming in and the estate was not settled until April, 1885 ; and yet he told her he thought the personal property would pay all the debts. She had often before been on the land, and was qualified by experience, as was her husband, to form an opinion of its character, condition and value.   She distinctly admitted that she knew as fully and well as did the defendant, the will, the devisees, the estate and her interest therein.   He offered her for it the sum of $1,000, in cash.   She conferred with her husband and made inquiry about it of others—among whom she named Ike Powell, a relative—and having so satisfied herself that it was not enough, she so informed him, saying she was going to try to sell to somebody and that if he, the defendant, didn't buy it, some one else would.   She also stated what was not true—that Powell had offered $1,200; to which he replied that if anybody would give that amount he would, as he did not want a stranger to have it.   Again she consulted and inquired.   Powell hadn't the money.   Her husband was in debt and paying interest.   They wanted cash.   They didn't get another offer of $1,200, cash.   After talking over the matter between themselves, according to his statement,

they "came to the conclusion that if what he said in regard to the situation of the real estate—that we could not have it sold under the will without a decree—we expected it was as good as we could do to take $1,200." And so they said to him, "Now if this is the situation of things, as you have stated, and if you are willing for us to go up there and ask Mat's and Ike's advice about the matter, and if they advise us not to sell it we will not do it, but if they don't advise us that way we will sell it for $1,200." He assented. She advised him of her acceptance, and she procured Powell to prepare the deeds. She signed them before her husband did, and upon his objecting to sign, defendant told them to "drop it all and burn the deeds;" but, as she says, "he studied it over, I guess, and signed."

All of the foregoing is taken from her testimony, excepting the single statement quoted as from his, from which it would seem she was quite as active in working up the sale as the defendant. There was no appearance of pressure or urgency or even persuasion on his part, nor of any special confidence in him on hers. She acted on her own judgment and that of her husband and other friends, as if he had been a stranger. So far as relates to his knowledge and influence and her ignorance and confidence, her testimony is in direct contradiction of the averments in the bill; and her husband's, relating to the same fact, accords with it.

But whatever may have been the truth in that respect we have looked in vain through the bill, proofs, decrees and argument for the specification of a word, an act or an omission on the part of appellant that is charged, proved, found or asserted to have been fraudulent. The same witnesses positively and completely exonerate him. Complainant testified, "I don't pretend to say that my brother here deceived me wilfully, but he did buy that land of me when it was worth more than he said it was. I know this, because he sold it for more." That is her case in a nutshell, as she understood it. It amounts to this: that she thought now, it was worth more when she sold than she thought then. And her thought was but an inference from a single fact which did not warrant it.

When she sold, there was no railroad near the land, nor any in contemplation, so far as the parties were informed. Soon afterward it began to be talked of, and when he sold—more than nine months later—it had been surveyed and located and a station near the land determined on. The worth of the land was what it would bring. She sold for $1,200, cash, and he, nearly a year after, for $1,468.75, one-half cash and the other on a year's time. Such an enhancement in that time is no uncommon effect of the location of a railroad in the vicinity.

Again, she testified, "I would not say my brother told me a falsehood  *  *  *  but he did misrepresent things to me." Being asked in what respect, or how, she said he told her it couldn't be sold under the law without a decree of court, which would involve a considerable cost, and that the land was not in as good condition as when the testater died, because the fences had gone down and the crops were poor, and he didn't consider it worth near as much as before that time. She was then requested, "If he ever made any other misrepresentation, please state it. And her answer was: "I don't know as I can think of it. I wouldn't say that he did." And she added, "I don't pretend to say that these statements were false, but I do pretend to say that it was worth more, because it brought more." The bill contained not a word about any representation as to fences or crops, nor is there in the record a word of proof that the fences had not gone down or that the crops were not poor. Neither the complainant nor her husband denied the truth of anything they say he stated as matter of fact. He charges no misrepresentation except as to the necessity of a decree of court in order to have the land sold, which was, that it could not be lawfully sold, while there was a minor heir, without such a decree. They knew that was matter of opinion, and that appellant did not profess any special knowledge of the law, nor represent that he had taken any legal advice on the subject. If he expressed only his real opinion, then, however mistaken, it could not have been frandulent.

That it was his honest opinion and belief is put beyond

doubt by his oaths and his acts. If he had supposed he had power to sell, there was no reason for refusing or delaying to exercise it. It was desirable that the parties interested, including himself, should realize and control their respective interests as soon as might be. But it is evident that they understood they had an interest in the land itself, as tenants in common; for they talked of dividing as well as of selling it. What appellant proposed to buy and appellee to sell was her interest in the land. Their contract was executed by a deed of quit-claim of her interest in the land specifically described. He understood that his office and function were those of an administrator, notwithstanding the annex, and that as such, having no need to sell in order to pay debts of the estate, he had nothing to do with the land, but its disposition rested with the heirs or devisees. They all knew that one of them, Hayden Dowdall, had died very soon after the death of the testator, leaving an infant child, and it was plain to him that this little child could not take a binding part in a partition or sale. Hence the supposed necessity for a decree of court. Appellant swears that he fully so believed, until advised to the contrary by the county judge long after he had made the purchase from appellee. By direction of that officer he filed his petition for leave to sell, and made the sale in conformity with the order so obtained.

We think it was quite easy and natural for a man who was not a lawyer, and especially for one of "large business experience," to make all the mistakes appellant did, and to be so confident in his opinion as to want no lawyer's advice about it. To entertain such an opinion and to express it and to act upon it without such advice, may not be very wise or prudent, but certainly it is not fraudulent.

In our opinion, then, if the bill states a case of fraud by wilful misrepresentation of facts and abuse of confidence—which is by no means clear—it finds no substantial support in the proof. The decree, annulling the contract of sale and canceling the deeds, was therefore erroneous. And if the court below was not justified as to the relief by the case made it could grant none further, for want of jurisdiction. Hence

it is unnecessary to inquire into the particulars of the decree, although we do not see from the record on what ground the master and court found the share of complainant, which the bill and the will stated as exactly one-eighth of the proceeds of the personal as well as of the real estate, to be so much more nearly one-seventh. They also charged appellant with the rent of the land accrued after the death of the testator, and also with the interest on the note given by Burke for half of the price on its sale to him. While he might be properly so charged in favor of the other parties, who retained their interests in the land or its proceeds, he should not be in favor of appellee if he had lawfully bought hers. Appellant testified that the personal estate proper, all went to the payment of debts of the estate.

But for the reasons above given the decree will be reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.

*Reversed and remanded.*